UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES | Case No. 13 CR 312 |
| v. | The Honorable Matthew F. Kennelly |
| PERCY CONRAD MAY, JR.<br>SHANIN MOSHIRI<br>RAJIV KANDALA | |

## GOVERNMENT'S MOTION TO ADMIT CERTAIN EVIDENCE

The UNITED STATES OF AMERICA, by its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, moves this Court for a pretrial ruling authorizing the admission of certain evidence against defendants Percy Conrad May, Jr., Shanin Moshiri and Rajiv Kandala that is direct evidence of the charged violations of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(1)(A), or, alternatively, pursuant to Federal Rule of Evidence 404(b).

### *Direct Evidence and Federal Rule of Evidence 404(b)*

Direct evidence of defendants' charged criminal conduct is generally admissible, while evidence of other uncharged acts is subject to additional evidentiary scrutiny. Specifically, Federal Rule of Evidence 404(b) permits the introduction of other-act evidence to prove motive, intent, preparation, plan, knowledge or absence of mistake, among other grounds, but prohibits its admission for the purpose of proving a person's character or propensity to behave in a certain way. *See* Fed. R. Evid. 404(b).

In *United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) (*en banc*), the Seventh Circuit directed that, in assessing the relevance of other-act evidence, trial courts should look to "the non-propensity theory that makes the other-act evidence relevant and specifically ask[] how the

evidence tends to make a particular fact of consequence more or less probable." *Gomez*, 763 F.3d at 856. This other purpose "must be established through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character." *Id.* at 860-61. Proposed other-act evidence must also clear the hurdle of Rule 403, *i.e.*, its probative value must be weighed against its potentially prejudicial effect. *Id.* at 857; Fed. R. Evid. 403. This Rule 403 balancing should "take account of the extent to which the non-propensity fact for which the evidence is offered actually is at issue." *Gomez*, 763 F.3d at 860.

By this motion, the government seeks to introduce evidence that:

- Each defendant solicited and received the charged concealed kickbacks, as part of a series of payments designed to compensate them for their patient referrals;

- Sacred Heart agreed to pay a staff physician to care for Kandala's patients, while allowing Kandala to bill for that physician's services, in return for Kandala's past and anticipated patient referrals; and

- Kandala arranged for his patients to be transported to Sacred Heart irrespective of the patients' geographic proximity to the hospital.

This evidence is offered by the government as direct evidence of the crimes charged. Alternatively, the proposed evidence is admissible under Rule 404(b) to establish the defendants' motive, intent, preparation, plan, knowledge and absence of mistake.

## I.     FACTUAL ALLEGATIONS

Defendants Percy Conrad May, Shanin Moshiri, and Rajiv Kandala were physicians who had privileges to treat patients at Sacred Heart Hospital—a small, acute care facility located on Chicago's west side. Sacred Heart, at its administrators' direction, paid physicians, including the

defendants, concealed kickbacks for their patient referrals.[1]  Those payments were concealed in different ways.  May was paid pursuant to an alleged lease agreement.  Sacred Heart paid Moshiri under a contract obligating Moshiri to provide teaching and administrative services to the hospital's podiatric residency program.  Kandala was paid pursuant to a consulting agreement.  Finally, Sacred Heart further compensated both May and Kandala by assigning medical professionals to work for them.  While the defendants sometimes provided services consistent with the purported purpose of the payments they received—*i.e.*, Sacred Heart periodically used the space it rented from May and Moshiri provided some instructional direction to the hospital's podiatric residents—these contracted for services were not needed and/or were purposefully overcompensated.  Rather, as alleged in the superseding indictment, the true purpose of the payments provided was to obtain the physicians' patient referrals.

## A.     The May Kickback Arrangement

In March 2004, Sacred Heart signed a lease to rent space in May's clinic—the May Medical Center.  Sacred Heart did not actually need and did not fully utilize the space it rented from May.  Rather, the purpose of the lease was to serve as cover to pay May for his patient referrals.

Under the terms of the lease (as amended by a contemporaneously signed addendum), Sacred Heart agreed to pay the May Medical Center $5,000 a month purportedly to rent the use of three exam rooms, the clinic's pharmacy and its waiting area.  In December 2009, Sacred

---

[1]     Edward Novak owned Sacred Heart and served as the hospital's president and chief executive officer.  Roy Payawal was Sacred Heart's vice president of finance and chief financial officer.  Anthony Puorro served as Sacred Heart's chief operating officer from approximately June 2011 through April 2013; Clarence Nagelvoort preceded Puorro as Sacred Heart's chief operating officer, serving in that position from approximately August 2007 through April 2011; Edward Lorgeree was the hospital's chief operating officer in the years preceding Nagelvoort. As explained herein, these administrators arranged the kickback relationships underlying the charges alleged against May, Moshiri and Kandala.

Heart reduced the amount of its purported monthly rent from $5,000 to $2,000, without amending any other lease terms. To compensate May for its reduced lease payments and to induce his continued referral of patients, Sacred Heart directed Joanna Forberg (nee Szwajnos), a physician assistant employed by Sacred Heart, to work for May in his medical clinic.[2] In particular, Forberg was assigned by Sacred Heart's administrators to work for May two, half-days a week. At May's direction, Forberg evaluated and treated patients. May, however, billed insurers for the services Forberg provided. May did not pay Forberg or Sacred Heart for Forberg's services. May therefore obtained the benefit of Forberg's labor (*i.e.*, billings) without having to actually pay for the cost of her labor. From March 2003 through April 2013, Sacred Heart paid May approximately $427,000 in purported lease payments. Sacred Heart further paid Forberg approximately $11,250 in salary for services attributable to her work for May.

As the government will establish at trial, Sacred Heart paid these lease payments and assigned Forberg to work for May in return for May's patient referrals. May is charged in the indictment with five specific payments provided as part of this arrangement. In particular, May is charged in Counts Twenty-Seven, Twenty-Nine, and Thirty-One in connection with his unlawful receipt of kickback payments concealed as rental payments, and in Counts Thirty-Five and Thirty-Seven in connection with his receipt of Forberg's services.

### B. The Kandala Kickback Arrangement

In April 2012, Sacred Heart, at its administrators' direction, entered into an alleged contract in which the hospital purportedly retained Kandala to educate hospital patients and staff on issues concerning palliative care and the treatment of the elderly, frail elderly and other terminally ill patients requiring hospice care. Under the terms of that contract, Kandala was

---

[2] In addition to Forberg, Sacred Heart also assigned another physician assistant, Doug Willaman, to work for May on a similar number of occasions.

allowed to bill the hospital up to 23 hours a month at a rate of $175 an hour for his services. Kandala's contract, however, was illusory. Kandala did not provide the contracted for services to Sacred Heart. In fact, he rarely went to the hospital. Kandala nevertheless billed Sacred Heart the maximum $4,025 allowable under the contract each month. Although aware that Kandala was not providing the services reflected in his invoices, Sacred Heart's administrators continued to pay Kandala because the payments made were not actually for services rendered. Rather, they were disguised bribes paid in return for Kandala's patient referrals.

In addition to these fraudulent contractual payments, Sacred Heart's administrators established a supplementary kickback arrangement to compensate Kandala for his patient referrals. Specifically, Sacred Heart arranged for one of its physicians, Dr. Vijay Pallekonda, to care for Kandala's Sacred Heart patients, while allowing Kandala to bill for those services.[3] At Sacred Heart's request and direction, Pallekonda treated Kandala's Sacred Heart patients. Kandala agreed to pay Pallekonda for those services, albeit at below-market rates. Pallekonda in turn agreed to work for Kandala at a discount because Sacred Heart promised to provide Pallekonda future bonuses to account for his lost professional revenue. This arrangement benefitted Kandala, who billed for Pallekonda's services, without paying the full cost of the labor provided to him.

From July 2012 through March 2013, Sacred Heart paid Kandala approximately $36,225, allegedly for developing the hospital's palliative care program. Kandala also billed Medicare and Medicaid for the services Pallekonda provided to his patients. Kandala is charged in Counts

---

[3] Pallekonda worked in Sacred Heart's emergency room and as an anesthesiologist in its operating room. Under the terms of his contract, Pallekonda was paid $200,000 a year to work 36 hours a week in the E.R., and an additional $1,100 a day for his anesthesiology services. Pallekonda's care for Kandala's patients was in addition to these assignments.

Fifty-One and Fifty-Three with soliciting and receiving concealed kickbacks as part of the purported contractual arrangement.

### C. The Moshiri Kickback Arrangement

Sacred Heart had a podiatric residency program. Staff podiatrists participated in that program by working with residents in the hospital's out-patient podiatric clinic, allowing the residents to scrub in on surgeries at the hospital and at affiliated surgical centers, and by guiding the residents in assigned didactic activities such as lectures and a monthly "journal club." Sacred Heart also used the residency program—and the purported need to instruct its resident-participants—as a means to conceal payments to certain podiatrists—including Shanin Moshiri—for their referral of podiatric surgical procedures.

In December 2006, Sacred Heart, at its administrator's direction, entered into an alleged "physician independent contractor agreement" in which Moshiri was to act as a purported "director of external office rotations" for the hospital's residency program. From approximately December 2006 through November 2008, Sacred Heart paid Moshiri $2,000 a month for those alleged services.[4] From December 2008 through May 2010, Moshiri's payments increased to $4,000 a month, or $48,000 annually—more than Sacred Heart paid its podiatry residency program director. From June 2010 through April 2013, Moshiri's payments were reduced back to $2,000 a month.

As the government will establish at trial, Moshiri did not perform services that justified the payments he received.[5] Instead, the government will show that the payments Sacred Heart provided Moshiri were for his patient referrals. In total, Sacred Heart paid Moshiri

---

[4] The hospital was, at the same time, paying another podiatrist purportedly for the same services.

[5] Other podiatrists performed services comparable to or in excess of those of Moshiri for free.

approximately $200,000 from December 2006 through April 2013 pursuant to his alleged podiatric residency administration contracts.  Moshiri is charged in Counts Forty-Five, Forty-Seven and Forty-Nine with specific payments as part of this arrangement.

## II.     EVIDENCE ESTABLISHING THE ONGOING NATURE OF THE DEFENDANTS' KICKBACK ARRANGEMENTS IS ADMISSIBLE.

As set forth above, each defendant received kickbacks from Sacred Heart pursuant to purported contractual arrangements that provided him with an ongoing, series of payments. Evidence of those long-term relationships is admissible as direct evidence of the defendants' charged violations of the anti-kickback statute.  The defendants received consistent payments over time while failing to perform the obligations set forth in the contracts that purportedly justified those payments.  The nature of the defendants' ongoing financial relationships with Sacred Heart—payments despite lack of performance—reveals that the contracts purportedly justifying those payments were designed simply to conceal the true purpose of the payments provided—payoffs for patient referrals.  The defendants' historical relationship with Sacred Heart therefore serves as direct evidence of the anti-kickback violations charged.

At trial, the government will show that the contractual relationships between the defendants and Sacred Heart were fraudulent and that the payments to defendants were provided as remuneration for their patient referrals, not the purposes alleged in their contracts.  These arrangements in turn reveal the unlawful nature of the charged payments.  By way of example, Sacred Heart's agreement to pay for the space leased from the May Medical Center and the payment of this lease on a monthly basis despite not actually needing the space reveals the illegitimacy of the alleged lease payments that are the subject of Counts Twenty-Seven, Twenty-Nine, and Thirty-One.  Sacred Heart was not paying May for the space it leased, but the patients he referred.  Similarly, Kandala's failure to perform actual services consistent with the terms of

his contract from the contract's inception through the spring of 2013 reveals that Sacred Heart never expected Kandala to provide consulting services in return for payments he received, including those charged in the indictment. Instead, the consideration provided for Sacred Heart's payments was the patients he referred. The same is true for payments provided to Moshiri. For over six years, Sacred Heart paid Moshiri for services he did not provide and which Sacred Heart obtained from other podiatrists for free. Evidence of that ongoing arrangement demonstrates that the payments identified in the indictment were not for services rendered, but kickbacks, as charged.

Evidence of the payments Sacred Heart provided May, Moshiri and Kandala is alternatively admissible under Rule 404(b). As an initial matter, it is clear that evidence of Sacred Heart's continuous payments to the defendants is not offered for character or propensity purposes—the only type of evidence precluded by Rule 404(b). Evidence that Sacred Heart used fraudulent contractual agreements to conceal the bribes paid to the defendants does not reflect on their character. It simply reveals the true nature of the defendants' relationship with Sacred Heart and the purpose of the payments the hospital provided—a permissible purpose under Rule 404(b).

Moreover, the defendants' ongoing receipt of Sacred Heart kickbacks evidences the nature of the arrangement pursuant to which they received the payments charged in the indictment. Each defendant is charged with the receipt of specific payments as part of an ongoing scheme to sell their patient referrals. Evidence of that plan or scheme is not offered for propensity purposes, but to reveal the true purpose of the particular charged payments, and therefore is admissible under Rule 404(b). *See United States v. Murphy*, 768 F.2d 1518, 1535 (7th Cir. 1985) (evidence that defendant had received bribes not charged in indictment

admissible to show a common plan and absence of mistake). In other words, because the defendants' long-term financial relationships reveal the nature of the schemes used to pay them for their patient referrals, evidence of those relationships is admissible. *See United States v. DeCicco*, 370 F.3d 206, 213 (1st Cir. 2004) (holding that the district court erred by excluding under 404(b) evidence of fires that predated two charged fires where that evidence was probative as to whether the charged fires had been set as part of a common scheme or plan).

Evidence of the defendants' historical financial relationship with Sacred Heart is also admissible to establish their intent to trade these payments for referrals, their knowledge of the purpose of the charged payments—*i.e.*, the payments status as bribes and not for legitimate purposes—as well as the absence of any mistake regarding the reason for the payment. *See*, *e.g.*, *United States v. Rodriguez-Estrada*, 877 F.2d 153, 155-56 (8th Cir. 1989) (holding that the admission of 31 uncharged checks that were "virtual replicas of those that formed the basis of the indictment" was appropriate under Rule 404(b) as they "afforded compelling proof" of intent, the absence of mistake and a calculated plan). For example, May received kickbacks concealed as lease payments from Sacred Heart from March 2004 through April 2013 as well as an assigned physician assistant (Forberg) whose work he could bill for without having to pay her salary. Sacred Heart's ongoing payments, despite its lack of need for the space it had purportedly leased, and the provision of Forberg around the time it dropped the amount of the monthly rent payments, evidence that May could have had no misconception regarding the purpose for which the hospital was paying him nor why it provided him the particular checks identified in Counts Twenty-Seven, Twenty-Nine and Thirty-One. Similarly, Kandala was paid under his palliative care consulting contract from July 2012 through March 2013 despite not providing any actual deliverables under that contract. Again, the hospital's ongoing payments to Kandala evidence

Kandala's intent to trade referrals for those payments as well as his knowledge of the purpose for which he received the particular payments that are the subject of Counts Fifty-One and Fifty-Three.[6]  Finally, Moshiri received payments from Sacred Heart from December 2006 through April 2013, allegedly for his instructional and administrative services to Sacred Heart's podiatric residency program.  During those six-and-a-half years, Moshiri did not provide services that would have justified the payments he received—including the payments alleged in Counts Forty-Five, Forty-Seven and Forty-Nine.

Finally, the decision to admit other act evidence under Rule 404(b) requires an analysis of the potential prejudicial effect of the proffered evidence under Rule 403.  *Gomez*, 763 F.3d at 857.[7]  Here, evidence establishing the defendants' ongoing receipt of payments from Sacred Heart is not prejudicial.  The defendants have all claimed that their receipt of payments from Sacred Heart was earned: May has claimed that Sacred Heart actually leased May Medical Center space; Moshiri claims that he taught podiatric residents; and Kandala claims that he was developing a palliative care program.  Accordingly, evidence that the defendants actually received the periodic payments contemplated under the contracts that purportedly justified the charged payments is not prejudicial.  Moreover, evidence that the defendants received multiple

---

[6]  Similarly, the invoices that Kandala had previously provided Sacred Heart's administrators evidence the illegitimacy of the invoices that served as the basis for the payments identified in Counts Fifty-One and Fifty-Three.  Month after month, Kandala provided Sacred Heart nearly identical invoices as purported justification for the payments he requested.

[7]  The concern of prejudice, however, is diminished in a bench trial in which the Court can distinguish between the permissible and impermissible purposes of proffered evidence.  See United States v. Reed, 744 F.3d 519, 525 (7th Cir. 2014) (district court was better "equipped [than a jury] to understand the limitation against the use of propensity evidence," and presumed to have distinguished between the probative and impermissible uses of such other-act evidence); see also United States v. Sperl, 458 Fed. Appx. 535, 542-53 (6th Cir. 2012) ("Because this [Rule 404(b)] evidence was admitted during a bench trial, there was little danger of any prejudicial effect."); United States v. Musleh, 106 Fed. Appx. 850, 856-57 (4th Cir. 2004) (Rule 403 "is relaxed significantly in the context of a bench trial.") (citing Schultz v. Butcher, 24 F.3d 626, 632 (4th Cir. 1994)).

payments, as their contracts contemplated, is not prejudicial. *Cf. United States v. Nolan*, 910 F.2d 1553, 1562 (7th Cir. 1990) (other act evidence was not prejudicial because it could not have any bearing on the jury's determination of the actual charges).

### III. THE KANDALA-PALLEKONDA RELATIONSHIP EVIDENCES THE ILLEGITIMACY OF KANDALA'S CONSULTING PAYMENTS.

Two counts of the indictment charge Kandala with the receipt of the patient referral kickbacks that were concealed as payments for his alleged consulting services. The payments Kandala received pursuant to that contract, as set forth above, were only a portion of the bribe paid. Sacred Heart's promise to pay Pallekonda for treating Kandala's patients was also an integral part of Kandala's kickback agreement. Evidence of the Pallekonda arrangement is therefore admissible as direct evidence of the charged kickbacks.

As an initial matter, Pallekonda's work for Kandala is relevant because it shows how Kandala could send his patents to Sacred Heart without actually providing their in-patient care. At trial, the government will show that Kandala had no interest in treating his patients at Sacred Heart, but that he was nevertheless willing to refer his patients to the hospital in return for the benefits the hospital provided.

In order to effectuate this arrangement Sacred Heart had to find a doctor to fill-in for Kandala, without forcing Kandala to forego the income from the treatment of the referred patients. Sacred Heart therefore had to find a way to not only treat Kandala's patients, but to compensate him for that work despite Kandala's absence. Pallekonda was the answer to the conundrum. The Pallekonda arrangement thereby establishes the means (*i.e.*, *modus operandi*) by which Kandala could refer his patients to Sacred Heart.

Evidence of the Pallekonda arrangement further demonstrates the illegitimacy of the payments Sacred Heart provided Kandala under his purported consulting agreement in how

Sacred Heart and Kandala treated the Pallekonda arrangement as a component of that agreement. The connection between the two kickback components is evident from Kandala's efforts to renegotiate his payment-for-patients relationship with Sacred Heart in March 2013. In particular, Puorro and Kandala met on the evening of March 19, 2013. Puorro, who was then cooperating, recorded the conversation. At the onset of their meeting, Puorro handed Kandala an envelope containing the $4,025 check that is the subject of Count Fifty-Three, and stated: "Novak wanted me to give you your check for the month. . . . We want to thank you for your business. . . . And hopefully you can bring more business to the hospital for us." G.E. 94-a (03/19/13). In the conversation that followed, Kandala noted that the physician coverage arrangement he had with the hospital was not working—his patients were not consistently covered and Kandala was unable to profit from the patients' care. *Id.*[8] As Puorro described the problem: "Right. So, you've got two issues. One is no primary care for the patient, and the second thing is, you can't bill for it." *Id.* Kandala proposed a revision to his arrangement with Sacred Heart to address the issue. Kandala wanted to bill more hours under his consulting contract and not deal with his own patients' care whatsoever. Summarizing Kandala's proposal, Puorro stated: "So, the message I bring back to Ed Novak is: Spoke with Dr. Kandala, he wants to renegotiate his contract, increase the amount of hours or the hourly rate, . . . and you would send more patients over to the hospital." G.E. 94-b (03/19/13). Kandala confirmed that was the message:

> Puorro: So, uh, what you're saying is, the hospital would pick uh, like [Physician], the salary for [Physician].

---

[8] Kandala, in particular, complained that Pallekonda had not rounded on his patients daily and he was unable to bill for patient care on those days in which there were no notes to substantiate claims for service. G.E. 94-a (03/19/13). Sacred Heart had, in the interim, fired Pallekonda. Puorro had therefore tried to arrange for another physician to replace Pallekonda. In their March 19, 2013, conversation, Kandala stated that the replacement physician was not working because he wanted Kandala to pay for a higher percentage of his service. *Id.*

| | |
|---|---|
| Kandala: | But then you'd bill out as well. |
| Puorro: | Bill for the hos-- for the hospital, the technical service. |
| Kandala: | And physician service. |
| Puorro: | And the physician service. |
| Kandala: | Yeah, because you get the whole Chihuahua. |
| Puorro: | I see. I see. |
| Kandala: | I don't because it doesn't make sense for me to, you I don't want to be in a situation… |
| Puorro: | Right. So how would you make your money? |
| Kandala: | This is where we re-negotiate… |
| Puorro: | Oh, so re-negotiate the contract to increase the hours… |
| Kandala: | Increase the hours, yeah. |
| Puorro: | Or the hourly rate so you don't have to do any professional fee billing but you just get a monthly check that's even higher. |
| Kandala: | (UI) yeah. |
| Puorro: | In exchange for the admissions. |
| Kandala: | Of course (UI) it's going to work is the understanding what's behind, you understand, because I don't want to deal with that part, I don't want to deal with just because it's too damned (UI) |
| Puorro: | It's too difficult for you to put doctors in your corporation. |
| Kandala: | Chasing him, and then… |
| Puorro: | I see. |
| Kandala: | Chasing him and then he is not going to do the billing. You guys can (UI). If you guys do that to me, you're gonna make me run away. |

*Id.*[9]

---

[9] When Puorro briefed Novak on the dinner the following day, *i.e.*, that Kandala would forego the "professional fee billing" of his patient admissions in return for an "increase [in] the amount of hours in his existing contract," Novak agreed, but stated that Kandala would "gotta actually come in here and do the work. Gotta do it." "You know, can't be a tit for tat, cause that's, that's illegal." G.E. 57-c (03/21/13).

Kandala's proposal evidences the illegitimacy of his contract with Sacred Heart and the true purpose of the payments he received thereunder, including those referenced in Counts Fifty-One and Fifty-Three: payment-for-patients. Evidence establishing the Pallekonda services component of the kickback arrangement is therefore direct evidence of the related unlawful contractual payments Kandala received as charged in the indictment.

Alternatively, evidence of the Kandala–Pallekonda relationship is admissible under Federal Rule of Evidence 404(b). Again, Sacred Heart's subsidy of Pallekonda's salary is not offered for propensity purposes. Rather, it evidences Kandala's motive in referring his patients to Sacred Heart, his intent to trade those referrals for benefits, his knowledge that the contract he had with the hospital was a sham, and the absence of any mistake regarding the purpose of the hospital's compensation. Put differently, Sacred Heart's promise to subsidize Pallekonda's services for Kandala in return for Kandala's patient referrals reflects the agreement between the parties without impermissibly suggesting that Kandala received the charged payments based on a predisposition to solicit and receive kickbacks. Moreover, the prejudicial effect of this evidence is minimal if any, as Kandala has admitted that Pallekonda worked with him and helped Kandala by seeing his patients at Sacred Heart.

### IV.   KANDALA SENT PATIENTS TO SACRED HEART REGARDLESS OF THEIR PROXIMITY TO THE HOSPITAL.

Finally, the government proposes to introduce evidence demonstrating that, as alleged in the conspiracy counts of the indictment, Sacred Heart's administrators and Kandala used the hospital's "direct admits" procedure to ensure the delivery of paid-for patients to the hospital, irrespective of where the patients otherwise resided. This evidence is admissible as direct evidence of the charged offenses. To the extent that use of Sacred Heart's "direct admit"

procedure can also be characterized as a separate bad act, it is admissible under Fed. R. Evid. 404(b) to show how Kandala delivered his end of the kickback arrangement with Sacred Heart.[10]

As alleged in the conspiracy count of the indictment, "to maximize the benefits to Sacred Heart from bribe-and-kickback-induced referrals. . . , [the defendants] implemented procedures designed to ensure that patients were transported from nursing homes and facilities directly to Sacred Heart irrespective of the patients' proximity to Sacred Heart." R. 231, ¶ 6. The defendants arranged for patients to be shipped to Sacred Heart's emergency room from nursing homes located all over the Chicagoland area. The length of the patients' travel was, at times, significant. Despite the fact that there were often multiple different hospitals at which these patients could have received emergency care if required, Kandala and Sacred Heart's administrators directed ambulances to take those patients to Sacred Heart. The ambulances carrying these patients bypassed multiple, closer facilities, including hospitals at which Kandala had privileges.

To ensure that ambulance drivers did not re-direct patients to hospitals in geographic proximity to their residences, Sacred Heart established a code to ensure the patients were delivered to Sacred Heart. Kandala and Sacred Heart's administrators directed nursing home operators to send patients to Sacred Heart with the instruction that they were to be "directly admitted" to "Room 200A." There was no patient Room 200A. The directive was just a code used to ensure the patients' delivery. By characterizing the patients as "direct admits" to a purported assigned Sacred Heart bed, ambulance drivers would not divert the subject patients to closer emergency care facilities. Novak acknowledged the purpose of the "direct admit" scheme

---

[10] Sacred Heart's direct admit procedure also demonstrated Kandala's control over the patient-beneficiaries that were the object/subject of their unlawful arrangement. *See United States v. Rodriguez*, 427 Fed. Appx. 784, 790 (11th Cir. 2011) (unpublished) (admitting evidence under Rule 404(b) to show defendants' "degree of control over patient beneficiaries").

in a September 12, 2012 recorded meeting in which he was trying to recruit yet another physician to refer patients to Sacred Heart: "You tell the ambulance it is direct admission Sacred Heart Hospital, Room 200A. That is the code word to come direct there." *See* G.E. 15-c (09/12/12).

The government filed a motion to elicit comparable evidence in the recent trial of defendants Novak, Nagelvoort and Payawal. In particular, the government sought to admit evidence that defendant Venkateswara R. Kuchipudi referred patients to Sacred Heart irrespective of their geographic proximity to Sacred Heart, utilizing the hospital's fraudulent "direct admit" code. *See* R. 508. The defendants—which at the time, included Kuchipudi— argued that the proposed evidence was precluded under Rule 404(b). *See* R. 538. The Court disagreed, finding the government's proposed evidence admissible as "relevant and admissible evidence of the alleged *quid pro quo* scheme." R. 566 at 2. The evidence that Kandala shipped his patients to Sacred Heart is admissible for the same reasons.

### *Conclusion*

For the foregoing reasons, the government respectfully submits that the Court should admit the evidence referenced herein.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:     s/ Joel M. Hammerman
JOEL M. HAMMERMAN
KELLY GREENING
BRIAN WALLACH
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

Dated: May 4, 2015